FILED
10/18/2024
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 9, 2024

**STATE OF TENNESSEE v. GENE A. HOSKINS, JR.**

**Appeal from the Circuit Court for Robertson County**
**No. 74CC4-2021-CR-432      Robert T. Bateman, Judge**

_____

**No. M2024-00064-CCA-R3-CD**
_____

The Defendant, Gene A. Hoskins, Jr., appeals the Robertson County Circuit Court's order revoking his probation and requiring him to serve the original three-year sentence for his aggravated assault conviction in confinement. The Defendant contends the trial court abused its discretion in revoking his probation and ordering him to serve his sentence in confinement (1) by failing to consider the consequence of the revocation as a separate discretionary decision, and (2) by failing to consider the interests of justice. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and JOHN W. CAMPBELL, SR., JJ., joined.

Jessica F. Butler, Assistant Public Defender-Appellate Division (on appeal); Dan Dalrymple, Assistant Public Defender (at hearing), for the Defendant, Gene A. Hoskins, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Johnny Cerisano, Assistant Attorney General; Robert J. Nash, District Attorney General; and Jason C. White, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On July 11, 2022, the Defendant entered a guilty plea to one count of aggravated assault and received a three-year sentence, which was suspended to supervised probation. On May 18, 2023, the State issued a warrant alleging that the Defendant had violated his probation by incurring new criminal charges of possession of a weapon by a convicted felon and driving on a suspended license. On September 8, 2023, the State issued a second

warrant, alleging that the Defendant committed a technical violation of probation when he tested positive for cocaine.

At the probation revocation hearing, the trial court noted that two of the Defendant's cases were on the docket that day; case number 2021-CR-432 was set for a hearing on a probation revocation and case number 2023-CR-664 was set for settlement on a failure to appear charge. The State explained that there were two revocation warrants at issue: one alleging that the Defendant received a new criminal offense for possession of a weapon by a convicted felon and a second regarding the Defendant's failed drug screen. The Defendant admitted that he violated the terms of his probation by failing the drug screen but contested the State's allegation that he also violated his probation by committing the criminal charge of possession of a weapon by a convicted felon.

Tennessee Highway Patrol Trooper Samuel Noakes testified that on New Year's Eve 2022, he was patrolling Lebanon Road in Wilson County and observed a silver Dodge 1500 pickup failing to maintain his lane. Specifically, he noted the truck's wheels crossed "the fog line" and crossed "the center dividing" line "multiple times." Trooper Noakes followed the truck for two or three miles, until the driver of the truck took the exit ramp and "failed to use his turn signal" before making a left turn onto Highway 109 from Highway 70. Trooper Noakes said that because of these traffic violations, he "activated his emergency equipment and conducted a traffic stop[.]"

Thereafter, Trooper Noakes approached the truck and observed that the Defendant was the driver, and there was one female passenger. In response to Trooper Noakes questioning, the Defendant denied failing to maintain his lane and asserted that he was not under the influence of any substances before Trooper Noakes asked if he had consumed any alcohol or drugs. Trooper Noakes also noticed that the female passenger was "sweating profusely" and seemed to be "very confused." He processed both the driver's and passenger's licenses and found that both licenses were suspended. He discovered a warrant for the Defendant's arrest from Robertson County for a violation of probation and learned that the Defendant had been convicted for felony evading arrest and aggravated assault, which was accompanied by a warning in the system "to use caution." Trooper Noakes stated that dispatch confirmed that the Defendant's probation violation warrant was "active" out of Robertson County and that Wilson County was willing to extradite the Defendant. Upon learning that the Defendant had an active warrant, Trooper Noakes knew he would have to arrest the Defendant and "requested a back-up unit due to the nature of [the Defendant's] previous charges."

Once additional officers arrived, Trooper Noakes approached the driver's side of the truck, and Wilson County deputies approached the passenger side. Trooper Noakes asked the Defendant to step out of the vehicle and asked if he had any drugs or weapons

that could harm him, and the Defendant said he did not. He then conducted a pat-down search on the Defendant and discovered that the Defendant had an empty "gun holster" on his hip. Trooper Noakes again asked the Defendant if he had any weapons with him or in his truck, and the Defendant replied that he had left them at his house. Trooper Noakes then took the Defendant into custody and placed him in the back of his patrol car. He noted that aside from arresting the Defendant for the probation violation from Robertson County, he also charged the Defendant with possession of a firearm by a convicted felon and driving on a suspended license.

Thereafter, Trooper Noakes and another deputy conducted a search of the truck and discovered a Springfield XD5 handgun in the truck's center console. Trooper Noakes confirmed that this handgun was loaded and had a bullet in the chamber.

On cross-examination, Trooper Noakes acknowledged that the Defendant's possession of a firearm by a convicted felon charge was still pending in Wilson County. He confirmed that the Defendant's traffic infractions were recorded on his dashcam. Although Trooper Noakes stated that he did not bring his dashcam recording to the hearing, he asserted that he watched the recording prior to providing his testimony at the revocation hearing.

Trooper Noakes was shown a photograph of the intersection of Highway 70 and Highway 109. He acknowledged that the exit ramp from Lebanon Road to Highway 109 split into two lanes. When asked if the Defendant would have needed to signal which lane he was in as the lanes split, Trooper Noakes said the Defendant "went to the left" but he could not recall "if [the Defendant] was on the right and changed to the left or what motions he made in that instance." He admitted it was "possible" that the Defendant was on the left side of the lane as the lane split and stayed on the left side. Trooper Noakes noted that this intersection was controlled by a traffic light and explained that "the left lane is for [vehicles going] straight and left; the right lane is [for vehicles going] right only[.]" Trooper Noakes stated the Defendant should have used his turn signal because the Defendant turned left and proceeded north.

Trooper Noakes said that he checked the ownership of the silver truck but could not recall whether it was registered to the Defendant or the Defendant's father. He confirmed that he did not know the identity of the purchaser or owner of the Springfield XD5 handgun. Although Trooper Noakes acknowledged that this handgun could have been owned by anyone, he stated that the Defendant was the one wearing the holster. At the end of cross-examination, the trial court asked Trooper Noakes if he was notified of the underlying charge for the Defendant's probation violation warrant, and he replied affirmatively, stating that the underlying convictions for the probation violation warrant were the Defendant's convictions for aggravated assault and evading arrest.

On redirect examination, Trooper Noakes confirmed that when he asked the Defendant to step out of his truck, he knew he was going to arrest him because dispatch had already confirmed with the Robertson County Sheriff's Office that the arrest warrant was valid and that the Wilson County Sheriff's Office was willing to extradite him. He agreed that because of the Defendant's prior conviction for aggravated assault, he felt it necessary to conduct a pat-down search. He also agreed that when he discovered the holster on the Defendant's person, this gave him reasonable suspicion that there might be a gun on the Defendant's person or in the truck. Trooper Noakes said that when he asked the Defendant about whether he had a gun with him, the Defendant's said he did not have a gun on him or in his truck but that he had guns at his house. Although Trooper Noakes said he did not confirm that the handgun found in the truck fit into the Defendant's holster, he said that this was a "handgun holster that a regular handgun would fit down in" and that there was nothing to indicate that the handgun found in the truck would not fit in the holster the Defendant was wearing.

The Defendant testified in his own behalf at the hearing. He denied that he had been drinking prior to his arrest and stated that he was never charged with driving under the influence. The Defendant said that he was driving his father's truck at the time Trooper Noakes stopped him and that the handgun in the truck's center console belonged to his father. The Defendant maintained that he first became aware of the handgun's presence in the truck that evening after he had already left home.

The Defendant claimed that he was "driving very carefully" and that when he turned the first time, he was showing his passenger where he used to live in Mt. Juliet. Although the Defendant agreed that Trooper Noakes followed him for "quite a ways[,]" he claimed he was driving extremely carefully because he knew law enforcement was following him.

When asked if he used his turn signal when it was appropriate that night, the Defendant stated, "To be honest with you, I don't recall changing a lane." He stated that he "went straight down Highway 70 all the way to where it hits Highway 109" and then took the exit ramp. He said his understanding was when the exit lane became two lanes, both lanes turned left, and he "wasn't in need of a blinker at that moment because [there were] two-lane[s] going left." He said that although Trooper Noakes had testified that there was a lane that went straight, he did not recall "having a straightway going to the other ramp across the street[,]" but he could have "missed that."

When the Defendant was asked if he thought Trooper Noakes' dashcam would have provided a better moment-by-moment depiction of the Defendant's driving that night, the Defendant replied, "I personally would like to see that myself. I asked him five times or so that night to see the video because he claimed I swerved[,] and I know better than that."

- 4 -

The Defendant confirmed that he had not yet had his court date for the possession of a firearm and driving on a suspended license charges in Wilson County.

On cross-examination, the Defendant admitted that he had an active arrest warrant at the time Trooper Noakes stopped him on Highway 109. He also admitted that Trooper Noakes found a handgun in the center console of the truck he was driving and that he was wearing a holster at the time he was stopped. The Defendant claimed he was wearing the holster because he had shot a BB gun earlier that day and had neglected to take the holster off before leaving the house. He stated that at the time of his arrest, he was in the process of moving back to Memphis to help his father, who was a paraplegic. Although the Defendant claimed that the truck he was driving at the time of the stop belonged to his father and was not his main vehicle, he admitted this truck was registered to the Defendant's home address in Portland, Tennessee.

On redirect examination, the Defendant stated that he did not have any siblings, and he was the sole caretaker for his unmarried, paraplegic father, who wore a diaper. He stated that it was his desire to return to caring for his father in Memphis.

On recross-examination, the Defendant explained that his father became paralyzed during a fall in February or March 2023. He admitted he was living in Memphis with his father when he used cocaine, but "since then, [he had] turned his life over to the good Lord" and was "trying to change things." He claimed he used cocaine only one time at a friend's birthday party, and he admitted he was "guilty for the drug screen." The Defendant claimed he attended the first court appearance in this case but missed the second court appearance. He said he called the court to let them know that his father had just left ICU, and although the court clerk told him he needed to be present, he did not appear and received the failure to appear charge. He admitted that his first violation of probation for the possession of a firearm and driving on a suspended license charges was issued May 5 and that he used cocaine the following August.

In response to questioning from the trial court, the Defendant said that although his father was originally living in a nursing home after his injury, his father decided to come home, and because his primary care doctor never released him from the nursing home, the insurance would not pay for his care, and the Defendant had been caring for his father since then. He said that during his incarceration in this case, his father was being cared for by his father's "drunkard buddy" and his father's "looney" brother but was not receiving adequate care. The Defendant claimed that when he talked to his father two days earlier, his father said he had been wearing a dirty diaper that had not been changed for two and a half hours and was feeling sick, which let him know that his father was not doing well.

- 5 -

During closing arguments, the State asserted that the proof showed the truck the Defendant was driving belonged to him because it was registered to his address and that the Defendant was "just trying to blame his father to get out of his gun charge." The State then argued that it had proven by a preponderance of the evidence that the Defendant possessed the firearm as a convicted felon and that the Defendant's probation should be revoked and that he should be ordered to serve his sentence in confinement.

Defense counsel acknowledged that the Defendant had committed a technical violation of his probation by testing positive for cocaine. Regarding the alleged violation for the possession of a firearm by a convicted felon charge, defense counsel argued the Defendant claimed he did not commit any traffic infractions prior to the stop because he knew the trooper was behind him. Defense counsel also asserted that if one looked at the intersection at issue, it seems to show that the Defendant did not need to activate his turn signal because the intersection seemed to force cars to make a left or right turn where it splits. Lastly, defense counsel argued that there was not a preponderance of proof regarding the Defendant's knowing possession of the firearm. He asked the trial court to wait until the possession of a firearm charge was heard in Wilson County, and stated that if the Defendant was ultimately convicted of that charge, the court could "come back and revoke him to serve [his sentence in confinement]." Relying on that argument, defense counsel asked the trial court to only sanction the Defendant for the technical violation of testing positive for cocaine.

When the trial court asked what the disposition would be if the court found the Defendant in violation of probation for the possession of a firearm charge, defense counsel suggested that the court give the Defendant time served after giving him jail credit or that the court order the Defendant into confinement until the "early part of next year," which would allow for the Defendant to care for his father, settle his Wilson County case, and settle his open failure to appear case in this court.

The trial court noted that on November 18, 2022, the State filed "an initial violation of probation warrant and report . . . alleging a misdemeanor arrest of failure to appear and that matter was ultimately dismissed by a resolution with the State, as I believe the underlying charges in another county, the failure to appear was resolved." In addition, the court said that it granted a motion to withdraw a capias when the Defendant failed to appear in this matter because the Defendant's father was at a nursing home in Shelby County, and the underlying violation of probation warrant was dismissed. On May 5, 2023, the State filed a probation violation warrant because the Defendant had been charged with driving on a suspended license and possession of a weapon by a convicted felon. Then, on September 8, 2023, the State filed an amended probation violation warrant alleging that the Defendant failed to pass a drug screen, and the Defendant admitted he violated his probation by testing positive for cocaine.

- 6 -

The trial court specifically "credit[ed] the testimony of the [t]rooper over that of the Defendant." It noted that it was "unrefuted that the Defendant had a holster on his person when he was arrested" and it was "unrefuted that a firearm was found in the truck." The trial court also noted that there was nothing to contradict Trooper Noakes' testimony that the Defendant, a convicted felon, told him he did not have guns on him that night but did have "guns at home." Ultimately, the trial court found "that the State ha[d] proven by a preponderance of the evidence that the Defendant ha[d] a new arrest and that he was in possession of a firearm, which [wa]s prohibited" because of his previous aggravated assault conviction and under the terms of his probation. While the trial court acknowledged that the possession of a firearm by a convicted felon charge had not been heard by the trial court, it stated that there was "a different standard" for this court to apply at the revocation hearing. The court then found that both the drug screen violation and the new charge of possession of a weapon by a convicted felon "ha[d] been proven by a preponderance of the evidence."

Lastly, the trial court discussed the appropriate consequence for these violations, stating:

> As to disposition, the Court . . . acknowledges that [the Defendant's] father is in—apparently, from the proof in the record, is in a situation where he needs care. It is unfortunate that the Court cannot solve all problems. The Court does take [the father's need for care] into account. . . . I do show that the Defendant has had several failures to appear. I show that he has a three-year sentence to serve as a Range One Offender, which would be at thirty percent, at least thirty percent before [his] release eligibility date. Considering all the circumstances, the Court is not happy it has to do this[,] but it feels that probation should be terminated[,] and [the Defendant] is ordered to serve the sentence [in the Tennessee Department of Correction]."

At the conclusion of this hearing, the trial court noted that case number 2023-CR-664, which was the Defendant's outstanding failure to appear charge, was set for January 26, 2023.

On December 14, 2023, the same day as the probation revocation hearing, the trial court entered a written order of revocation. In it, the trial court stated that it conducted a "full hearing" on the warrants alleging the probation violations. It noted that the Defendant "admitted that he used cocaine but requested a hearing on the new crime of possession of a firearm by a convicted felon." The court said that after hearing proof on this matter, it "found by a preponderance of the evidence that the [D]efendant committed the new criminal offense of possession of a firearm by a convicted felon." It also found, based on the Defendant's admission, that the Defendant had "used the schedule II substance

cocaine." The court then held that "[b]ased on these violations, the [D]efendant's probation shall be revoked and the [D]efendant shall be ordered to serve the remainder of his 3[-]year[] sentence in the Tennessee Department of Correction[]." The court also provided the Defendant jail credit for the time he had already spent incarcerated in this case.

Thereafter, the Defendant timely filed a notice of appeal.

## ANALYSIS

The Defendant argues that the trial court abused its discretion in revoking his probation and ordering him to serve his sentence in confinement, claiming the trial court "either failed to adequately consider the options available to it regarding the consequence [for the probation violation] or failed to place adequate support for its decision on the record." Specifically, the Defendant asserts (1) the trial court did not properly consider the consequence of his probation violation as a separate discretionary decision, and (2) the trial court did not make the decision regarding the consequence of the violation with the interests of justice in mind. Consequently, the Defendant argues that this court should reverse the trial court's revocation order, and after conducting a de novo review, reinstate him to probation so he can resume his caregiving responsibilities for his father. The State counters that, given the Defendant's repeated failures to comply with the terms of his probation, the trial court acted within its broad discretion in determining that the Defendant had violated his probation and that full revocation was the appropriate consequence for these violations. Based on this record, we conclude that the trial court did not abuse its discretion in revoking the Defendant's probation and ordering him to serve his sentence in confinement.

Trial courts "possess the power, at any time within the maximum time that was directed and ordered by the court for the suspension, in accordance with § 40-35-311, to revoke the suspension." Tenn. Code Ann. § 40-35-310(a). Code section 40-35-311 provides the procedures trial courts must follow during probation revocation proceedings.

"[A] trial court may revoke a sentence of probation upon finding by a preponderance of the evidence that the defendant has violated the conditions of his release." State v. Beard, 189 S.W.3d 730, 734-35 (Tenn. Crim. App. 2005); see State v. Dagnan, 641 S.W.3d 751, 756 (Tenn. 2022). The statutes in effect at the time of the Defendant's revocation hearing authorize a trial court, after finding a defendant had violated probation, to impose one of the following consequences: (1) order incarceration for some period of time; (2) cause execution of the sentence as it was originally entered; (3) extend the defendant's probationary period by up to one year for each violation of Code section 40-35-308(c)(1); or (4) return the defendant to probation on appropriate modified conditions. Tenn. Code Ann. §§ 40-35-308, -310, -311; see Dagnan, 641 S.W.3d at 756 (citing Beard, 189 S.W.3d

- 8 -

at 735 and n.2). If the trial court revokes a defendant's probation and suspension of sentence, then the defendant has the right to appeal. Tenn. Code Ann. § 40-35-311(e)(3); Tenn. R. App. P. 3(b).

Probation revocation involves the following two-step consideration: "[a] trial court, upon finding by a preponderance of the evidence that a defendant violated the conditions of his or her probation, must determine (1) whether to revoke probation, and (2) the appropriate consequence to impose upon revocation." Dagnan, 641 S.W.3d at 753, 757 (footnote omitted). While a trial court is required to conduct a probation revocation hearing pursuant to Code section 40-35-311(b), this two-step consideration does not obligate the trial court "to hold an additional or separate hearing to determine the appropriate consequence." Id. at 757. These two steps are "two distinct discretionary decisions, both of which must be reviewed and addressed on appeal." Id. at 757-58. "Simply recognizing that sufficient evidence existed to find that a violation occurred does not satisfy this burden." Id. at 758.

This court reviews a trial court's revocation of probation for an "abuse of discretion[1] with a presumption of reasonableness so long as the trial court places sufficient findings and the reasons for its decisions as to the revocation and the consequence on the record." Id. at 759. "It is not necessary for the trial court's findings to be particularly lengthy or detailed but only sufficient for the appellate court to conduct a meaningful review of the revocation decision." Id. (citing State v. Bise, 380 S.W.3d 682, 705-06 (Tenn. 2022)). Sufficient findings serve "'to promote meaningful appellate review and public confidence in the integrity and fairness of our judiciary.'" Id. (quoting State v. King, 432 S.W.3d 316, 322 (Tenn. 2014)). However, "[w]hen presented with a case in which the trial court failed to place its reasoning for a revocation decision on the record, the appellate court may conduct a de novo review if the record is sufficiently developed for the court to do so, or the appellate court may remand the case to the trial court to make such findings." Id. (citing King, 432 S.W.3d at 327-28).

First, the Defendant argues the Defendant did not properly consider the consequence for the violation as a separate discretionary decision. He claims the trial court reached its decision to order incarceration based only on its finding that a probation violation occurred and purportedly on the Defendant's prior failures to appear. The Defendant asserts that his prior failures to appear were not raised by the State and that there is no proof of these prior infractions in the appellate record, even though the trial court detailed the prior failures to appear in its oral findings. The Defendant asserts that "[e]ven taking the prior failures to

_____

[1] "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." State v. Phelps, 329 S.W.3d 436, 443 (Tenn. 2010).

appear into account, the trial court stated that one of the charges had been dismissed, and in the other, the trial court had ultimately recalled the capias because [the Defendant] was with his father in a nursing and rehabilitation facility in Shelby County at the time."

Second, the Defendant contends that the trial court did not make the decision regarding the violation consequence with the interests of justice in mind. He claims "the trial court gave no consideration to the range of options at its disposal nor did the trial court consider and craft a punishment that would serve the ends of justice, as well as the interests of Mr. Hoskins and the greater public." See State v. Giles, No. E1999-02236-CCA-R3-CD, 2000 WL 1100329, at *3 (Tenn. Crim. App. July 31, 2000) (reiterating that a revocation decision is best tested by whether it would serve the ends of justice and be in the best interest of both the public and the defendant). The Defendant claims that he testified at length that his father was paralyzed and had failing health, that he was his father's only caregiver, and that he was moving to Memphis to provide his father with full-time care. He claims that although the trial court acknowledged that the Defendant's father needed care, it dismissed his father's needs by stating it was "unfortunate that the Court cannot solve all problems" before ordering the Defendant to serve his three-year sentence in confinement. The Defendant argues that the trial court's decision "was not one that served the interests of justice, the interests of the community, or the interests of [the Defendant] and his family." He also emphasizes that while it is "not necessary for the trial court's findings to be particularly lengthy or detailed," sufficient reasoning must exist to promote meaningful appellate review. Dagnan, 641 S.W.3d at 759. The Defendant maintains that the trial court was "in the unique position to address these particular problems" and could have reinstated him "to probation with additional, more stringent conditions, reinstated him to start probation anew, extended his probation sentence by one year, or ordered him to serve some lesser period of time in confinement before returning to probation." He claims that by ordering him to serve his three-year sentence in confinement, "the trial court not only removed [the Defendant] as a productive, self-sufficient member of society, but potentially placed his father in peril as well" by "depriving his father of a necessary caregiver."

We reiterate that once the trial court determines that a defendant's probation must be revoked, the trial court must then decide on an appropriate consequence. Id. at 757. In determining the proper consequence, the trial court may consider "the number of revocations, the seriousness of the violation, the defendant's criminal history, and the defendant's character." Id. at 759 n.5. However, consideration of a defendant's "past criminal history is only appropriate in the second part of the two-step analysis." Id. (citing State v. Fleming, No. E2017-02352-CCA-R3-CD, 2018 WL 6787580, at *3 (Tenn. Crim. App. Dec. 26, 2018) ("A trial court may not revoke probation based on past criminal acts that were known to the trial court at the time probation was originally granted.")).

The record shows the trial court identified the facts it considered and provided specific reasoning for revoking the Defendant's probation and ordering him to serve his sentence in confinement. See id. at 759. The transcript of the probation revocation hearing includes three pages of oral findings by the trial court. See id.

At the conclusion of the probation revocation hearing, the court accredited Trooper Noakes' testimony over the Defendant's testimony. The court noted it was unrefuted that the Defendant was wearing a holster at the time of his arrest and that the officers found a handgun in the center console of the truck, which was registered to the Defendant's address in Portland, Tennessee. The court also found there was nothing to contradict the trooper's testimony that the Defendant, a convicted felon, admitted at the scene that he had guns at his home. In addition, the court noted that the Defendant admitted he tested positive for cocaine while on probation. Ultimately, the trial court found that the State had established both violations, that the Defendant had committed the offense of possession of a handgun by a convicted felon and had tested positive for cocaine, by a preponderance of the evidence.

After finding that the State had proven by a preponderance of the evidence that the Defendant violated the conditions of his probation, the trial court made the "two distinct discretionary decisions" regarding (1) whether to revoke the Defendant's probation, and (2) the appropriate consequence to impose upon revocation of the Defendant's probation. See id. at 757. First, the trial court held that "[c]onsidering all the circumstances," which it had previously detailed, it was appropriate to revoke the Defendant's probation. See id. Second, the trial court specifically considered the appropriate consequence. See id. The trial court acknowledged that the Defendant's father needed care and that while it would "take that into account," the court could not "solve all problems." The court noted that multiple probation warrants had been filed against the Defendant, that the Defendant had committed multiple probation violations, and that the Defendant failed to appear in court on several occasions, including a failure to appear charge that was still outstanding at the conclusion of the revocation hearing. The court stated that while "it was not happy to do this[,] . . . probation should be terminated[,]" and it "ordered [the Defendant] to serve [his] sentence." Because the record shows the trial court made the findings and provided reasoning for the "two distinct discretionary decisions" required under Dagnan, its decision to revoke the Defendant's probation and to order him to serve his sentence in confinement is entitled to a presumption of reasonableness on appeal. Id.

After carefully considering the record, we conclude that there was overwhelming evidence supporting the trial court's decision to revoke the Defendant's probation and to order him to serve his sentence in confinement. See id. at 760. Accordingly, the Defendant is not entitled to relief.

- 11 -

## CONCLUSION

Because the trial court did not abuse its discretion in revoking the Defendant's probation and ordering him to serve his three-year sentence, less jail credits, in confinement, we affirm the judgment of the trial court.

_____

CAMILLE R. MCMULLEN, PRESIDING JUDGE